## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **SCOTT FORTNEY,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:25-cv-00868** |
| | § | |
| **LLANO COUNTY, TEXAS; BILL** | § | |
| **BLACKBURN; JAMES TREADWAY;** | § | |
| **RANDY "TY" SHAW; RUSSELL** | § | |
| **WESSON; DUSTIN SCHUETZ; BRAD** | § | |
| **EVANS, and RONALD BOWMAN.** | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Scott Fortney brings forth this 42 U.S.C. § 1983 case against Defendants Llano County, Texas ("Llano County"), former Llano County Sheriff Bill Blackburn; and Llano County Deputies James Treadway, Randy "Ty" Shaw, Russell Wesson, Dustin Schuetz, Brad Evans, and Ronny Bowman (all in their individual capacities) (collectively "Defendants" when including all Defendants, and "Defendant Deputies" when exclusively referring to individual Deputies collectively) for violations of his constitutional rights.

## I.    EXECUTIVE SUMMARY

Defendant Deputies entered Mr. Fortney's commercial semi-truck sleeper cab without a warrant and deployed an inadequately trained police K9 to attack him repeatedly while he lay asleep, injured, unarmed, and nonresistant. Following the attack, an injured and restrained Fortney complied with the deputies' conflicting orders to the extent he was able, yet the Deputies still instructed the K9 to attack him repeatedly, causing severe bite injuries. Deputies then unlawfully searched his vehicle, including his sleeper cab, and found no firearm or evidence of

any crime. Without probable cause, Defendant Deputies still falsely charged Fortney with aggravated assault with a deadly weapon—charges the Llano County District Attorney later dismissed entirely because of the complete lack of evidence. Llano County and Sheriff Blackburn ratified this unconstitutional conduct through inadequate training and supervision of Defendant Deputies, and through setting and repeatedly affirming policies that permitted these violations, thus violating Mr. Fortney's rights under the Fourth and Fourteenth Amendments.  The actions of Defendants caused Mr. Fortney severe physical injuries, emotional trauma, and economic damage.

## II.   PARTIES

1.      Plaintiff Scott Fortney ("Fortney") is a resident of Kingsland, Texas.

2.      Defendant Llano County is a municipal government entity within the State of Texas and the public employer, or former employer, of Former Llano County Sheriff, Bill Blackburn, and each of the Defendant Deputies. Llano County also operates and oversees the Llano County Sherrif's Office ("LCSO"). Llano County may be served with process by serving the Llano County Attorney, Dwain K. Rogers, or the Llano County Clerk, Cecilia McClintock, or any of its County Commissioners, at 801 Ford Street, Llano, Texas 78643, or anywhere they may be found. Defendant will be extended the opportunity to accept service of process pursuant to FRCP 4(d) for itself, Bill Blackburn, and each of Defendant Deputies. If Defendant Llano County fails or refuses to accept service of process as requested, then Plaintiff will request service of process pursuant to FRCP 4(e) upon each Defendant.

3.      Defendant Bill Blackburn is the former Sheriff of Llano County, Texas, and at all relevant times he served as Llano County's final policymaker for law enforcement matters, including oversight of training, supervision, and discipline of Llano County Sheriff's

2

deputies. Blackburn is sued in his individual capacity for his personal role in authorizing, ratifying, or being deliberately indifferent to unconstitutional practices described herein. He may be served at his residence or place of business, or wherever he may be found, and Plaintiff intends to request Llano County accept service on his behalf pursuant to Federal Rule of Civil Procedure 4(d).

4.      Defendant Deputy James Treadway was, at all relevant times, a law enforcement officer employed by Llano County Sheriff's Office acting under color of state law. Treadway is sued in his individual capacity for compensatory and punitive damages for his direct participation in the constitutional violations described herein. Plaintiff intends to request that Llano County accept service on Treadway's behalf pursuant to FRCP 4(d). If Llano County refuses or fails to accept service, Treadway may be served individually at 752 Andy Taylor Drive, Suite A, Llano, Texas 78643, or wherever he may be found.

5.      Defendant Deputy Randy "Ty" Shaw was, at all relevant times, a law enforcement officer employed by Llano County Sheriff's Office acting under color of state law. Shaw is sued in his individual capacity for compensatory and punitive damages for his direct participation in the constitutional violations described herein. Plaintiff intends to request that Llano County accept service on Shaw's behalf pursuant to FRCP 4(d). If Llano County refuses or fails to accept service, Shaw may be served individually at 752 Andy Taylor Drive, Suite A, Llano, Texas 78643, or wherever he may be found.

6.      Defendant Deputy Russell Wesson was, at all relevant times, a law enforcement officer employed by Llano County Sheriff's Office acting under color of state law. Wesson is sued in his individual capacity for compensatory and punitive damages for his direct participation in the constitutional violations described herein. Plaintiff intends to request that

Llano County accept service on Wesson's behalf pursuant to FRCP 4(d). If Llano County refuses or fails to accept service, Wesson may be served individually at 752 Andy Taylor Drive, Suite A, Llano, Texas 78643, or wherever he may be found.

7.    Defendant Deputy Dustin Schuetz was, at all relevant times, a law enforcement officer employed by Llano County Sheriff's Office acting under color of state law. Schuetz is sued in his individual capacity for compensatory and punitive damages for his direct participation in the constitutional violations described herein. Plaintiff intends to request that Llano County accept service on Schuetz's behalf pursuant to FRCP 4(d). If Llano County refuses or fails to accept service, Schuetz may be served individually at 752 Andy Taylor Drive, Suite A, Llano, Texas 78643, or wherever he may be found.

8.    Defendant Deputy Ronny Bowman was, at all relevant times, a law enforcement officer employed by Llano County Sheriff's Office acting under color of state law. Bowman is sued in his individual capacity for compensatory and punitive damages for his direct participation in the constitutional violations described herein. Plaintiff intends to request that Llano County accept service on Bowman's behalf pursuant to FRCP 4(d). If Llano County refuses or fails to accept service, Bowman may be served individually at 752 Andy Taylor Drive, Suite A, Llano, Texas 78643, or wherever he may be found.

9.    Defendant Chief Deputy Brad Evans was, at all relevant times, a law enforcement officer employed by Llano County Sheriff's Office acting under color of state law. Evans is sued in his individual capacity for compensatory and punitive damages for his direct participation in the constitutional violations described herein. Plaintiff intends to request that Llano County accept service on Evans's behalf pursuant to FRCP 4(d). If Llano County

refuses or fails to accept service, Evans may be served individually at 752 Andy Taylor Drive,

Suite A, Llano, Texas 78643, or wherever he may be found.

### III.    JURISDICTION AND VENUE

10.    This Court has federal question jurisdiction over this 42 U.S.C. § 1983 action

pursuant to 28 U.S.C. §§ 1331 and 1343.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as all relevant events

occurred in this division and all Defendants reside in this state.

### IV.    FACTUL ALLEGATIONS

**A.    Llano County Deputies Conducted an Unconstitutional Warrantless Search Based on an Unverified Witness Report.**

12.    On June 18, 2023, Plaintiff Scott Fortney spent the afternoon boating on the Llano

River with his family.

13.    Fortney drives a commercial semi-truck for work which he left parked on his

property in Llano County, Texas.

14.    That evening, Fortney got into an argument with his brother, Sean Fortney.

15.    Fortney went back to his truck after this argument, and Sean Fortney and Rhionna

Fortney heard what they believed to be a gun shot.

16.    Many people were setting off fireworks on this night in Llano County, some of

which may have sounded like gunshots.

17.    Sean Fortney called the Llano County Sheriff's Office at 9:47 p.m.

18.    Sean and Rhionna Fortney went inside the garage and heard what they thought

were two additional gun shots.

19.    During the 911 call, Rhionna Fortney informed the operator that Plaintiff Fortney was in his white semi-truck.

20.    Deputy Bowman, Deputy Schuetz, and Officer Austin Boxwell from the Llano County River Authority arrived on the scene first.

21.    Deputy Wesson and Deputy Shaw arrived closely after Bowman, Schuetz, and Boxwell.

22.    After arrival, Bowman, Wesson, Shaw, and Schuetz began speaking with Sean and Rhionna Fortney and searching the property.

23.    Sean and Rhionna Fortney informed the Deputies that Plaintiff Fortney was in his white semi-truck.

24.    When Deputies arrived at Plaintiff Fortney's semi-truck, they were unable to locate him, and his phone did not ping as being on the property.

25.    Deputies observed the truck's curtains were closed and could not visually confirm whether anyone was inside.

26.    At approximately 10:12 p.m., Llano County dispatch notified Deputy James Treadway that a K9 unit had been requested. Because Treadway was the K9's handler, he immediately drove to the location where Fortney's semi-truck was parked.

27.    At approximately 10:28 p.m., Treadway arrived on the scene.

28.    Treadway then approached Wesson asking if he wanted to "clear everything" just in case the Fortney was still there.

29.    Wesson then spoke with Chief Deputy Brad Evans, and he directed the deputies to clear everything.

30.    Defendant Deputies formed a perimeter and remained stationed near Fortney's white semi-truck, suspecting Fortney to be inside.

31.    Defendant Deputies used the Public Address ("PA") system to command Fortney to exit the vehicle but received no response.

32.    Fortney was asleep at this point and could not hear the Deputies' commands.

33.    Defendant Deputies continued to surveil the truck for approximately 20 minutes without experiencing any threats, gunfire, or other sign of danger.

34.    Defendant Deputies discussed using force to open the truck and began to plan a tactical entry.

35.    Defendant Deputies did not seek or obtain a warrant to enter Plaintiff Fortney's sleeper cab.[1]

36.    Defendant Deputies were not even entirely sure that Fortney was in the sleeper cab.

37.    On information and belief, all but one of the doors of the cabin were locked.

38.    Schuetz tried to open the driver's side door of Fortney's sleeper cab, but it was locked and told the other Defendant Deputies that is was locked.

39.    Schuetz repeatedly tried to open the back door of Fortney's sleeper cab, which was latched from the inside.

40.    On Schuetz's body-worn camera ("BWC") footage, Schuetz said "It's locked...it's got like a chain lock to it."

41.    On Bowman's BWC footage, Bowman replied "From the inside?"

---

[1] A sleeper cab is a compartment in a semi-truck designed to allow drivers to rest and sleep during long journeys.

42.     Bowman then looked into a hatch on the side of Fortney's sleeper cab and stated, "I can see in the bed there's nothing."

43.     Moments later, Bowman then pointed his weapon into the side hatch and said "Show me your fucking hands."

44.     Next, Schuetz opened the passenger side door of Fortney's sleeper cabin, which appeared to be unlocked.

45.     Deputies forced entry into Fortney's sleep cab without a warrant and without Fortney's consent.

46.     At this point it had been over 40 minutes since deputies first arrived to Fortney's property and they had faced no resistance or anything that could be construed as danger.

47.     Fortney posed no immediate threat.

**B.     Defendant Deputies Forced Their K9 Deputy to Maul Plaintiff Fortney While He Slept.**

48.     Upon opening the door to the sleeper cab, Treadway yelled "Sheriff's Office, K9. Show me your hands, you're gonna get bit…we're gonna send the dog in, you're gonna get bit."[2]

49.     After receiving no response, Treadway lifted the K9 up and put him in the passenger seat of the car by the entry to the sleeper section of the cab.

50.     After lifting the K9 into the car, Treadway repeatedly began shouting to the K9 deputy "Stellen , Stellen."

51.     On information and belief, "Stellen" is a command given to police K9s to command them to attack.

---

[2] The entry and attack can be seen on Wesson's Body Camera Footage at the following link: https://1drv.ms/v/s!AmR5VgwKtXTYkf1rRMBT6JjO_vO-Zg?e=Ffsa47

52.    Treadway gave the "Stellen" command to the K9 immediately upon entering Plaintiff Fortney's truck.

53.    It was the first command that Treadway gave to the K9 when entering the vehicle.

54.    Treadway commanded the K9 to attack before he could visually determine whether Fortney posed any immediate threat or was planning on resisting or evading arrest.

55.    Treadway then directed the K9 to attack before he even knew if Fortney was in the truck, let alone resistant or armed.

56.    Upon opening the sleeper cab door, Treadway found Fortney asleep on the mattress within the confined space.

57.    Fortney did not offer any resistance or make any threats when the deputies opened the door.

58.    The sleeper area of Fortney's cab was approximately 11 feet from the back door to the sleeper area.

59.    The aisle walkway of the sleeper cab was approximately 26 inches wide.

60.    Once Treadway gained a visual on Fortney, he stated "Show me your fucking hands…you're gonna get bit."

61.    Treadway asked Fortney his name and he replied.

62.    At this point, Wesson began entering the vehicle from the passenger door.

63.    Treadway told Fortney "Show me your hands, get on the ground."

64.    Treadway shouted, "You're going to get bit."

65.    Fortney did not have a weapon and complied by putting his hands up. Fortney was still laying on the bed because he could not get up from the bed due to limited space and presence of Treadway and the K9.

66.    Bowman confirmed Fortney's compliance in the Incident Report that he wrote following the incident, stating "Scott raised up out of the bed and I ordered him to show his hands and he did so. Scott did not have a weapon in his hands."

67.    Despite Fortney's compliance, Treadway again gave the "Stellen" command again repeatedly. Fortney can be heard yelling in pain after Treadway gave the "Stellen" command.

68.    Treadway did not have his BWC activated at this moment. Fortney's scream of pain after Treadway gave this command is clearly heard on Wesson's BWC footage.

69.    Upon information and belief, at this moment, the K9 bite Fortney for the first time.

70.    When Wesson entered the sleeper cab itself, he witnessed Treadway holding the K9 by its harness over Fortney while Fortney was still on the bed.

71.    When the K9 was being held on top of Fortney, Treadway continued to tell the K9 "Stellen" and to bite.

72.    Fortney did not offer resistance at any point during this encounter.

73.    Fortney was clearly frightened and disoriented.

74.    When Treadway again gave the "Stellen" command, Fortney was clearly showing his hands in a sign of surrender.



75.    Wesson then grabbed both of Fortney's hands, securing them in front of Fortney's body.

76.    Fortney then stated, "My hands are right here, what happened?"

77.    Despite Fortney telling Treadway where his hands were, and Wesson securing both of Fortney's hands, Treadway again gave the "Stellen" command repeatedly.

78.    Wesson then pulled Fortney into the aisle of the cab to a standing position with his hands in front of him.

79.    At that point, Fortney was still restrained by Wesson and was not offering any resistance.

80.    Moments after Wesson pulled Fortney into a standing position, Fortney cried out in pain and the K9 bit Fortney again.

81.    Treadway commanded, "Put your hands behind your back."

82.    While Treadway stated "Put your hands behind your back," Wesson was holding Fortney's hands in front of him.

83.    Treadway stated: "I won't let the dog get off him until his hands are behind his back." When Treadway made that remark, Wesson was already restraining Fortney's hands which Treadway could clearly see.

84.    Fortney could not follow Treadway's instructions to put his hands behind his back because of Wesson's grip on him.

85.    During this entire encounter, Treadway repeatedly ordered the K9 to bite Fortney.

86.    Treadway and Wesson then pulled Fortney to the ground while Wesson was restraining him and the K9 unit was actively biting him.

87.    Treadway then stated "I won't let him off until you get on the ground."

88.    But Wesson had already dragged Fortney to the ground.

89.    Wesson told Treadway "[Fortney's] on me, he can't go no further."

90.    Treadway continued to command Fortney to get on the ground or continue to be bitten by the K9 even though Wesson already told Treadway that Fortney was on the ground.

91.    Even after Fortney was in handcuffs and compliant, Treadway had the K9 bite him for 8 more seconds.

92.    Treadway knew or should have known that permitting a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable.

93.    At this point, Deputy Shaw entered, got on the bed, and put his foot on Fortney's back, pressing him to the ground while he was being bit.

94.    The K9 bit Fortney for a total of 61 seconds.

95.    Treadway did not order the K9 to release Fortney until well after Fortney was already restrained.

96.    After the K9 let go, Fortney briefly passed out.

97.    Fortney involuntarily urinated on himself during the dog attack due to the extreme

pain and trauma, which was extremely humiliating.

98.    Later, Schuetz stated "I would've been pissing myself with that dog too."

99.    There were at least three separate bites made by the K9.

100.   One bite was on Fortney's lower left side.



101.   Another bite was on Fortney's hand.



102.    Another bite was around Fortney's left leg.



103.    On information and belief, Treadway later said the K9 was "nervous or scared" and reattached to Fortney's hand when "Wesson let his hand go for a second."

104.    This further confirms that Fortney was physically restrained and compliant when bitten again.

105.    Schuetz entered the cab after the K9 and observed the ongoing attack while standing near Fortney.

106.    Schuetz made no effort to intervene or stop the K9 from biting Fortney, despite Fortney being physically restrained and nonresistant.

107.    Shaw entered the cab during the K9 attack and witnessed the dog continuing to bite Fortney.

108.    Shaw said nothing to stop the K9 and failed to intervene despite Fortney's screams and restraint.

109.    Bowman stood outside the cab, watching the incident though the open door and listening to the screams.

110.    Bowman did not issue any command to stop the K9 and offered no assistance to remove the dog from Fortney.

111.    None of the Defendant Deputies intervened or attempted to stop the K9, despite having the opportunity to do so.

112.    Bowman, Wesson, Shaw, and Schuetz did not intervene or attempt to stop Treadway from allowing the K9 to maul Fortney.

113.    All Defendant Deputies were physically present during the K9 attack and failed to intervene despite clear indications of excessive force.

114.    After Fortney was subdued, handcuffed, and removed from the vehicle, Defendant Deputies began searching the sleep cab without a warrant and without consent.

115.    After Fortney was removed from the truck, Wesson called Deputy Tim McLean and asked, "Where am I allowed to search for the gun?" McLean replied that Wesson could only search areas Fortney could have reached.

116.    Despite this instruction, both Wesson and Bowman continued searching Fortney's entire truck, not just the sleeper cab, with Wesson reentering the trailer cab.

117.    Wesson also broke the lock on the back of Fortney's sleeper cab.

118.    Bowman stated, "We can have our bodycams off once we get him arrested, right?" before turning his camera off. The other Deputies followed, turning theirs off immediately afterward.

119.    Bowman and Wesson both turned their cameras off after discussing entering the trailer to search thoroughly.

120.    On information and belief, the decision by multiple Deputies to deactivate their body-worn cameras following Bowman's statement reflects a broader pattern of permitted noncompliance with body-worn camera protocols within Llano County.

121.    On information and belief, despite acknowledging the legal limitations of their authority, Defendant Deputies proceeded to search through the entire sleeper cab of Fortney's truck without a warrant, consent, or exigent circumstances.

122.    During this unlawful search, Deputies did not find any firearm or evidence of criminal activity.

123.    Deputies knew or should have known they lacked constitutional authority to search through Fortney's entire sleeper cab without a warrant under these circumstances.

**C.    As a Result of Llano County's Deputies' Actions, Fortney suffered serious injuries.**

124.    Fortney suffered severe physical injuries from the K9 attack, including multiple deep puncture wounds to his left leg, abdomen, and hand.

125.    The attack aggravated a prior medical condition: in February 2023, Fortney underwent artery bypass surgery and was temporarily cleared to return to work, but the trauma from the dog attack caused complications, including reopening of his surgical incision and the development of a full abdominal hernia.

126.    Fortney required a second major surgery to repair the hernia and was forced to take two and a half months off work to recover.

127.    As a professional truck driver, Fortney's ability to work and travel has been severely impaired due to his physical and psychological injuries.

128.    Fortney lost significant revenue and was forced to remain in Llano County for months due to the pending criminal charges and medical recovery.

129.    Fortney also has suffered significant mental and emotional injuries.

130.    Since the attack, Fortney has had difficulty sleeping in his truck, which also serves as his primary place of work, due to emotional distress, fear, and trauma from the incident.

131.    Fortney continues to suffer anxiety, nightmares, and ongoing psychological symptoms consistent with Post-Traumatic Stress Disorder (PTSD).

132.    Fortney's self-esteem and sense of self has been extremely damaged by this attack as well.

133.    The physical and emotional injuries caused by Defendants' misconduct have directly interfered with Fortney's ability to earn a living, safely rest in his truck, and maintain his overall physical and mental health.

134.    Fortney continues to experience chronic pain in his leg, abdomen, and hand, and his doctors do not expect that to change.

135.    Fortney has apparent nerve damage, as he has a numb feeling where the K9 attacked on left side.

136.    Fortney has permanent scarring from the K9 attack.

137.    Llano County's unconstitutional actions continue to affect Fortney to this day.

**D.    Llano County and its Decisionmakers Have Enacted Unconstitutional Patterns and Practices Regarding Warrantless Entries, Searches, Uses of Force, and Training.**

### a.  *Warrantless Entry*

138.    On information and belief, Llano County maintains a policy allowing deputies to enter dwellings, vehicles, or other private spaces without a warrant when the occupant is asleep, unarmed, or presenting no threat.

139.    That policy was the moving force behind the Defendant Deputies decision to enter Fortney's sleeper cab without a warrant.

140.    On information and belief, Chief Deputy Evans was at the scene and ratified this decision.

141.    It was or should have been obvious to Sheriff Blackburn that promulgating a policy allowing warrantless entries would lead to constitutional violations, such as what happened in this case.

### b.  *Canine Training and Use of Force*

142.    On information and belief, Llano County trains its Deputies to prioritize K9 entry before actual visual confirmation of the suspect's behavior, resulting in a pattern of excessive force incidents where no threat existed.

143.    That policy was the moving force behind Treadway's decision to sic the K9 unit on Fortney without first determining whether he was offering any resistance.

144.    It was or should have been obvious to Sheriff Blackburn that promulgating a policy allowing a deputy to sic a K9 unit on an individual without first determining if he was offering any resistance would lead to constitutional violations, such as what happened in this case.

145.    On information and belief, Llano County's policymaker, Sheriff Bill Blackburn, either directed, approved, or failed to intervene in the unconstitutional raid and K9 deployment on Fortney, thereby rendering the County liable for the resulting constitutional violations.

### c. Llano County Improperly Trained Deputies and its K9s.

146.    On information and belief, neither Treadway nor his K9 had received adequate training in constitutional limitations on force.

147.     On information and belief, Treadway's K9 was trained primarily to "bite and hold," not to de-escalate or disengage once a subject was subdued.

148.     On information and belief, the dog deployed by Treadway had previously bitten other suspects under unconstitutional circumstances.

149.    Llano County had no written policy limiting the duration of a K9 bite once a suspect was restrained.

150.    Llano County had no written policy on not allowing the K9 to bite restrained or non-resistant persons.

151.    Llano County has a specific policy that states K9 handlers must have the following qualification:

> "Have a strong desire to deploy the canine at every opportunity available regardless of inconvenience, weather conditions, time of day, difficult circumstances or personal problems."

152.    The same policy states "Depending on the circumstances, any act where a canine team is deployed may be considered the *use of force or deadly force*."

153.    On information and belief, the K9 was allowed to operate in confined, residential-like environments without any restrictions or specific training for such scenarios.

154.    On information and belief, Treadway did not receive yearly in-service training on constitutional use of force, including Fourth Amendment limits on K9 deployment.

155.    On information and belief, Llano County does not require K9 Deputies to complete updated certifications once a certain number of years on the force have passed.

156.    On information and belief, Treadway continued to train and deploy the K9 without documented supervision or use-of-force oversight from any superior officer.

157.    On information and belief, LCSO maintains no internal reporting mechanism for tracking K9 use-of-force incidents or reviewing them for constitutional compliance.

158.    On information and belief, Llano County failed to investigate or discipline Treadway for prior K9 deployments that resulted in serious injury.

159.    On information and belief, Llano County does not conduct routine reviews of body-worn camera footage involving K9 use of force.

160.    On information and belief, the dog used on Fortney was not trained to differentiate between active resistance and passive or confused behavior.

161.    On information and belief, Treadway had full visual confirmation that Fortney was not resisting yet he still released the K9.

162.    On information and belief, Treadway made no attempt to physically awaken and negotiate or secure Fortney's voluntary surrender before releasing the K9.

163.    Llano County authorized or ratified Treadway's decision to deploy the dog in these circumstances.

164.    Llano County does not require deputies to exhaust lesser means of force before deploying a K9.

165.    Fortney's case was not referred to any internal affairs process or use-of-force review board.

166.    On information and belief, Llano County failed to preserve relevant training records, use-of-force logs, or supervisory notes concerning Treadway and his K9.

167.    Treadway knew or should have known that deploying a dog into a confined, residential-type sleeper cab would likely result in unnecessary injury.

168.    Treadway delayed issuing the release command to the dog to prolong the application of force.

169.    None of the Defendant Deputies communicated any belief that Fortney posed an imminent threat before or during the K9 attack.

170.    Even if the dog biting was necessary, the duration of the dog bite exceeded what was necessary to secure Fortney's compliance.

171.    No deputy present believed or could reasonably believe that Fortney was attempting to flee or resist arrest.

172.    All Defendant Deputies failed to document or report the full extent of the force used during the K9 attack.

173.    No use-of-force investigation was initiated in connection with the dog bites to Fortney.

174.    Llano County, acting through the Llano County Sheriff's Office, has a widespread pattern, custom, or practice of deploying K9 units against non-resisting individuals without adequate oversight.

### d. *Turning Off Body Worn Cameras*

175.    Treadway failed to activate his body-worn camera during the deployment of his K9 on Fortney.

176.    Treadway was the only deputy on scene whose body-worn camera footage is not available for the time of the K9 attack.

177.    On information and belief, Treadway's body-worn camera was physically present on his vest during the incident but was not recording.

178.    On information and belief, Llano County policy did not require deputies to maintain active body camera footage during all use-of-force encounters.

179.    On information and belief, Llano County did not discipline or re-train Treadway for failing to record a major use-of-force incident.

180.    On information and belief, Llano County failed to preserve any potential footage from Treadway's body camera from that night.

181.    Treadway's absence of footage deprived Fortney of critical evidence regarding the circumstances and duration of the K9 attack.

182.    On information and belief, Llano County has no functioning supervisory system in place to verify compliance with its own body camera policy

183.    Treadway's failure to activate his camera is part of a broader pattern of noncompliance tolerated and ratified by Llano County.

184.    On information and belief, Llano County deputies frequently deactivate or fail to activate body-worn cameras during arrests involving force.

185.    On information and belief, Llano County does not require deputies to submit written justifications when body-worn cameras were inactive during arrests.

23

186.    On information and belief, Treadway's failure to record was intentional and designed to shield his actions from review.

187.    This lack of footage makes it impossible to fully reconstruct the moment Treadway released the dog, the duration of the bite, and the verbal commands or lack thereof issued to Fortney.

188.    On information and belief, Llano County has a policy or longstanding practice of permitting deputies to turn off body-worn cameras before applying force, impairing accountability and evidentiary transparency.

189.    On information and belief, Llano County has a policy or longstanding practice of permitting deputies to turn off body-worn cameras after applying force, impairing accountability and evidentiary transparency.

190.    On information and belief, Llano County ratified the conduct of the Defendant Deputies through its failure to investigate, discipline, or correct the obvious use of excessive force and unconstitutional search of Fortney's private space.

### e. Llano's Knowledge and Endorsement of Unconstitutional Acts

191.    Llano County failed to train its deputies—including Treadway, Wesson, Shaw, Bowman, and Schuetz—on Fourth Amendment limitations concerning warrantless entries, use of force on unconscious or incapacitated suspects, and the duration of K9 bites.

192.    Llano County failed to discipline, re-train, or supervise deputies who violated constitutional limits on use of force or warrantless searches, signaling official approval of such conduct.

193.    On information and belief, whoever was the highest-ranking officer at the scene, felt that the actions of the Defendant Deputies complied with Llano County's policy and that nothing that occurred was alarming nor to the level requiring an investigation.

194.    Llano County's policymaker for all matters related to the activities of the Llano County Sheriff's Office at all times relevant to this Complaint was Sheriff Bill Blackburn.

195.    Some Defendant Deputies have a history of failing to de-escalate, leading to their use of excessive force.

196.    Llano County Deputies have a history of using excessive force in situations that do not warrant it.

197.    Llano County Deputies, including Defendant Deputies, were never properly trained in de-escalation techniques.

198.    Llano County and former Sheriff Bill Blackburn knew of a pattern of Llano County Sheriff's Office ("LCSO") deputies (1) using excessive force, including prolonged and unjustified K9 attacks; and (2) conducting unlawful warrantless searches of private spaces.

199.    On information and belief, prior to the incident involving Fortney, Llano County had received multiple complaints or internal warnings about the conduct of Deputy Treadway and other Deputies involving the use of force and failure to properly document K9 deployments.

200.    Llano County was aware that its deputies—including Treadway, Bowman, and Wesson—routinely conducted warrantless searches of vehicles and dwellings under pretextual circumstances, particularly in rural areas where judicial oversight was minimal.

201.    Llano County, acting through LCSO and Sheriff Blackburn, failed to investigate or meaningfully discipline deputies for prior uses of force involving restrained individuals, thereby signaling official approval of such conduct.

202.    The conduct of Deputies Treadway, Wesson, Bowman, Schuetz, and Shaw in deploying excessive force and conducting a warrantless search was approved, ratified, or tolerated by Llano County and Sheriff Blackburn.

203.    On information and belief, Chief Deputy Evans was at the scene and ratified these decisions.

204.    As a direct and proximate result of Llano County's failure to supervise and train its deputies, Defendant Deputies violated Fortney's clearly established rights under the Fourth and Fourteenth Amendments.

205.    Thus, the Llano County had or ratified the following policies and/or practices when the Defendant Deputies assaulted and arrested the Plaintiff in this case:

    a.    A pattern, practice, or custom of deploying K9s in confined spaces to bite restrained or nonresistant individuals;

    b.    A pattern, practice, or custom of permitting warrantless searches without judicial authorization or exigent circumstances;

    c.    Failing to train Deputies on proper de-escalation tactics;

    d.    A pattern, practice, or custom of failing to enforce or supervise compliance with BWC requirements;

    e.    A pattern, practice, or custom or failing to discipline deputies whose use-of-force actions violated clearly establish constitutional rights.

206.    Sheriff Blackburn also failed to supervise the Defendant Deputies to ensure they followed the above-mentioned obligations and the other above-delineated policies, all of which caused the violation of Plaintiff's constitutional rights.

207.    Sheriff Blackburn was deliberately indifferent to the known and obvious consequences of these policies, practices, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them.

208.    Sheriff Blackburn was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference.

209.    Sheriff Blackburn was aware of the pattern of similar incidents that occurred before and after the Defendant Deputies violated Plaintiff's constitutional rights, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of the Llano County's above-delineated policies.

210.    Sheriff Blackburn was specifically aware that his deputies had violated the Constitution by failing to comply with their obligations in the incidents discussed in this Complaint, as well as in other incidents, and that no additional procedures, policies, training, or practices had been implemented that would resolve this ongoing risk of constitutional harm to citizens.

211.    Likewise, Sheriff Blackburn knew or should have known that failing to train his Deputies on the above-mentioned obligations was a particular omission in Llano County's training program that would cause Llano County employees to violate the constitutional rights of members of the public they encountered, like the Fortney.

212.    Nevertheless, though Sheriff Blackburn knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

**E.    Llano County Has a Prior History of Violating its Citizens' Rights.**

213.    The Llano County Sheriff's Office has a history of failing to adequately train, supervise, or discipline deputies.

214.    The Llano County Sheriff's Office has a history of continuing to employ deputies long after their propensity for excessive force and unlawful arrests becomes clear.

215.    In 2016, Jeffrey Grey Wise was shot and killed by three members of the Llano County Sheriff's Office. Deputies claim that he was armed, but in the seven years since the shooting, Llano County Sheriff's Office has not released the body camera footage.

216.    In 2018, a grand jury indicted Sheriff's Deputy Duncan Roberts on counts of official oppression after he and another officer attempted to pick a home's lock, and then broke down the door to arrest the individual inside.

217.    In an interview with local news station KXAN, Sheriff Blackburn called Roberts "a really good man."[3]

218.    On January 5, 2019, Sheriff's Deputy Jackson Idol arrested James Michael Glenn for having a crushed beer can in the back of his son's car. Deputy Idol then threw Glenn to the ground and placed him in a chokehold, causing Glenn to fall unconscious. When he regained consciousness, Glenn tried to get up and Deputy Idol repeatedly punched him in the face and hands. Glenn suffered a collapsed lung and a damaged diaphragm because of Deputy Idol's actions.

---

[3] https://www.kxan.com/investigations/series-of-indictments-nearly-wipes-out-llano-police-department/

219.    When the attack on Glenn occurred, Deputy Treadway, a Defendant in the present case, was the lead deputy on the scene and he supported Idol's actions.

220.    On January 13, 2019, Johnny Spradlin called the national suicide prevention hotline for help.  His call was referred to the LSCO, and Llano County deputies Steve Sifford and another officer arrived, slammed him to the ground and tasered him for no reason while conducting a "welfare check" at his home.

221.    In July 2019, Deputy Sifford was charged with Assault Family Violence and Unlawful Restraint after the Llano Police Department received a Domestic Violence complaint regarding him. He was ultimately discharged by the Llano County Sheriff's Office.

222.    In September 2019, Sifford was arrested on a felony charge for possession of child pornography.

223.    In October of 2022, Deputies of the Llano County Sheriff's Department shot and killed Justin Harrod, who was laying on the ground with his arms above his head.

224.    Deputy Shaw, involved in this case, was one of the deputies who shot Harrod.

225.    Deputies Bowman and Wesson were both involved in the incident that resulted in the shooting of Justin Harrod.

226.    The Llano County Sheriff's Office's history indicates a culture of violence, corruption, lack of training, and a lack of accountability among its deputies. As a result of this culture and failure to train and take accountability for their actions, Fortney suffered severe injury and harm that affects him to this day

**V.    CAUSE OF ACTION ONE: Fourth and Fourteenth Amendment – Excessive Force (42 U.S.C. § 1983) Against Defendant Deputy James Treadway, Russell Wesson, and Randy "Ty" Shaw**

227.    Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

29

228.    Defendant James Treadway, Russell Wesson, and Randy "Ty" Shaw while acting under color of law, used objectively unreasonable and excessive force against Plaintiff Scott Fortney in violation of clearly established constitutional rights.

229.    Treadway deployed a police K9 into Fortney's confined sleeper cab while Fortney was asleep, intoxicated, unarmed, and nonresistant.

230.    The K9 immediately attacked and bit Fortney multiple times, even after Fortney was visibly restrained.

231.    Wesson entered the cab and physically seized Fortney's wrists from the front, holding him in place while the dog continued to bite.

232.    Despite Fortney being fully restrained and nonresistant, Treadway allowed the dog to continue attacking.

233.    Shaw entered the cab and put his boot on Fortney's back, holding him in place while the dog continued to bite and Wesson restrained Fortney's hands.

234.    The prolonged and repeated K9 bites—including while Fortney was screaming in pain and unable to comply with contradictory commands—constituted separate, independent acts of excessive force.

235.    Each bite constituted a discrete application of force, and Defendants had an opportunity between bites to reassess and withdraw the force.

236.    Treadway acknowledged on BWC that he allowed the K9 to continue biting Fortney until his hands were behind his back—even though Deputy Wesson was already physically restraining them.

237.    Treadway delayed the release command despite Wesson's physical control over Fortney, prolonging the K9's use of force beyond any plausible law enforcement need.

238.    As a direct and proximate result of Defendants' conduct, Fortney suffered severe physical injuries, involuntary urination from trauma, psychological harm, and loss of income.

239.    Defendants' actions violated Fortney's clearly established rights under the Fourth and Fourteenth Amendments to be free from excessive force and unreasonable seizure

## VI.    CAUSE OF ACTION TWO: Fourth and Fourteenth Amendment – Failure to Intervene (42 U.S.C. § 1983) Against Defendants Wesson, Shaw, Schuetz, and Bowman

240.    Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

241.    While acting under color of law, Defendants Wesson, Shaw, Schuetz, and Bowman were all present during the excessive use of force against Fortney but failed to intervene, despite having a realistic opportunity to do so.

242.    Each of these Defendants witnessed the police K9 biting Fortney repeatedly, including after Fortney had been physically restrained, posed no threat, and was visibly in extreme distress.

243.    All four Defendant Deputies were within arms-length of the K9 attack, could see and hear Fortney's screams, and had the opportunity and means to stop the assault.

244.    All four Defendant Deputies affirmatively chose not to intervene.

245.    Defendants had a clearly established constitutional duty under the Fourth and Fourteenth Amendments to intervene to prevent the continued use of excessive force against a restrained, nonresistant, and unarmed individual.

246.    Despite having the opportunity and duty to act, Wesson, Shaw, Schuetz, and Bowman failed to prevent or halt the K9 attack, nor did they take any steps to protect Fortney from further injury.

247.    Their failure to intervene was consistent with a broader pattern in Llano County of non-enforcement of de-escalation and intervention protocols.

248.    As a direct and proximate result of their failure to intervene, Fortney suffered multiple deep puncture wounds, lasting physical pain, emotional trauma, and economic harm

**VII.    CAUSE OF ACTION THREE: Fourth Amendment – Warrantless Search and Entry (42 U.S.C. § 1983) Against Defendants Wesson, Bowman, Shaw, Schuetz, Evans and Treadway**

249.    Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

250.    Defendants Treadway, Wesson, Shaw, Schuetz, and Bowman, while acting under color of law, violated Fortney's clearly established Fourth Amendment rights by entering his private sleeper cab without a warrant, without consent, and in the absence of any exigent circumstances.

251.    Defendants Treadway, Wesson, Shaw, Schuetz, and Bowman, while acting under color of law, violated Plaintiff Scott Fortney's clearly established Fourth Amendment rights by searching his private sleeper cab without a warrant, without consent, and in the absence of any exigent circumstances.

252.    Defendant Evans, while acting under color of law, violated Plaintiff Scott Fortney's clearly established Fourth Amendment rights by authorizing the Defendant Deputies to enter Fortney's private sleeper cab without a warrant, without consent, and in the absence of any exigent circumstances.

253.    The initial entry occurred before any arrest or discovery of a firearm, at a time when Fortney was asleep, unarmed, nonresponsive, and posed no threat.

254.    The deputies did not seek judicial authorization before breaching the locked doors of his vehicle and getting into the sleeper cab.

255.    The pre-arrest entry was not justified by any recognized exception to the warrant requirement. There was no hot pursuit, no visible threat, no ongoing emergency, and no risk of destruction of evidence.

256.    Fortney was not fleeing, armed, or resisting. Deputies had ample time to secure a warrant but affirmatively chose not to.

257.    In fact, Defendant Deputies were not even sure if Fortney was in the sleeper cab since he did not respond to their knocks.

258.    Following the prolonged K9 attack and Fortney's arrest and removal from the truck, Defendant Deputies reentered the sleeper cab and conducted a second, full evidentiary search without a warrant or valid consent.

259.    Prior to this second search, Defendant Wesson consulted a supervisor or legal advisor by phone and was instructed he could only search areas Fortney could have accessed.

260.    On information and belief, despite this guidance, Wesson and Bowman searched areas far beyond that scope, including reentering the sleeper area and searching throughout.

261.    During or immediately before this post-arrest search, Bowman states, "We can have our bodycams off once we get him arrested, right?" before disabling his camera. Other Deputies, including Wesson, followed suit.

262.    On information and belief, these Deputies knowingly deactivated their BWCs in order to avoid creating a record of their warrantless evidentiary search, in further violation of clearly established law and Llano County policy.

263.    At no point did Defendant Deputies discover any firearm or other evidence of criminal activity during either the initial entry or the post-arrest search.

264.    The entry into Fortney's sleeper cab and the subsequent warrantless search were both objectively unreasonable and violated clearly established Fourth Amendment protections against unlawful entry and unreasonable searches of one's private residence or dwelling space.

265.    As a direct and proximate result of these unconstitutional intrusions, Fortney suffered emotional distress, reputational harm, and economic losses arising from the invasion of his private space and the use of criminal charges to justify the unlawful entry and search.

VIII.    **CAUSE OF ACTION FOUR: Municipal Liability Under Monell (42 U.S.C. § 1983) Against Defendant Llano County, Texas**

266.    Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

267.    The conduct by the Deputies identified in this complaint constituted excessive force, warrantless entry and search, and malicious prosecution in violation of the Fourth Amendment United States Constitution, as incorporated through the Fourteenth Amendment.

268.    At all material times, Defendant Deputies acted under color of state law, as agents of Defendant Llano County.

269.    At all material times, Defendant Deputies wore their official department uniforms and were acting within the course and scope of their duties as LCSO deputies at the time they violated Fortney's constitutional rights in multiple ways.

270.    As policymaker for LCSO, Bill Sheriff Blackburn approved of and ratified the Defendant Deputies' conduct and determined that they followed Llano County policies in their actions towards Fortney.

271.    Chief Deputy Brad Evans was on the scene and ratified the conduct of the Deputies.

272.    Llano County continues to approve and condone the conduct of these Deputies.

273.    Each of the above-described policies was actually known, constructively known, and/or ratified by the Llano County and its policymakers, including former Sheriff Bill Blackburn, and was promulgated with deliberate indifference to Plaintiff's rights under the United States Constitution.

274.    Moreover, the known and obvious consequence of these policies was that Llano County Deputies would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here would result.

275.    Consequently, the above-described policies were a moving force of Plaintiff's constitutional deprivations and injuries, and caused him to suffer serious injuries.

## IX.    CAUSE OF ACTION FIVE:   Supervisory Liability for Constitutional Violations (42 U.S.C. § 1983) Against Defendant Bill Blackburn

276.    Plaintiff adopts and incorporates herein by reference all preceding paragraphs.

277.    At all relevant times, Defendant Bill Blackburn served as the final policymaker for law enforcement operations in Llano County, with authority over the training, supervision, discipline, and conduct of deputies within the Llano County Sheriff's Office.

278.    Blackburn knew of repeated complaints and prior incidents involving Defendant Deputies—particularly Treadway—related to excessive K9 force, failures to de-escalate, warrantless entries, and body-worn camera noncompliance.

279.    Despite this knowledge, Blackburn failed to take corrective action, implement constitutionally compliant training protocols, or discipline deputies involved in these practices.

280.    Blackburn also failed to investigate or prevent the deployment of a K9 into a confined residential space without warrant or exigent justification, despite the clear risk of serious injury and constitutional harm.

281.    Blackburn was deliberately indifferent to the obvious consequences of these omissions and ratified the conduct at issue by failing to initiate disciplinary measures or refer the incident for internal affairs or supervisory review.

282.    Blackburn's failure to supervise, train, or correct his subordinates directly contributed to the excessive force, unlawful search, and malicious prosecution of Fortney in violation of his clearly established rights under the Fourth and Fourteenth Amendments.

283.    As a direct and proximate result of Blackburn's supervisory failures, Fortney suffered severe physical injuries, psychological harm, and economic damages, for which Blackburn is liable in his individual capacity under 42 U.S.C. § 1983.

## X.    DAMAGES

284.    As a result of Defendants' unlawful conduct, Plaintiff seeks the following damages:

a. Past and future lost wages and loss of earning capacity;

b. Past and future physical pain;

c. Past and future mental anguish;

d. Past and future impairment;

e. Past and future disfigurement;

f. Past and future medical expenses;

g. Attorneys' fees, including costs, expert fees, and attorneys' fees pursuant to 42 U.S.C. § 1988;

h.   Past and future damages for injury to Plaintiff's character and reputation;

i.   Pre-judgment and post-judgment interest at the highest rates allowable under the law;

j.   All other compensatory and/or general damages to which Plaintiff is entitled under state or federal law; and,

k.   Punitive damages in the highest amount allowed by law against Defendants Treadway, Wesson, Bowman, Schuetz, and Shaw only

## XI.    ATTORNEYS' FEES AND EXPERT FEES

285.    Plaintiff seeks all reasonable and necessary attorneys' fees in this case, including preparation and trial of this lawsuit, post-trial, pre-appeal legal services, and any appeals. Plaintiff additionally brings suit for expert fees.

286.    As a result of Defendants' conduct and their deliberate indifference to Plaintiff's rights, Plaintiff was forced to retain counsel.

## XII.    DEMAND FOR JURY TRIAL

287.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all the issues in this case and tenders herewith the requisite jury fee.

## XIII.    PRAYERS FOR RELIEF

288.    WHEREFORE, cause having been shown, Plaintiff prays for, on trial of this just cause, judgment against Defendants as follows:

i.   Past and future lost wages and loss of earning capacity;

ii.   Past and future physical pain;

iii.   Past and future mental anguish;

iv.    Past and future impairment;

v.    Past and future disfigurement;

vi.    Past and future medical expenses;

vii.    Attorneys' fees, including costs, expert fees, and attorneys' fees pursuant to 42 U.S.C. § 1988;

viii.    Past and future damages for injury to Fortney's character and reputation;

ix.    Pre-judgment and post-judgment interest at the highest rates allowable under the law;

x.    All other compensatory and/or general damages to which Fortney is entitled under state or federal law;

xi.    Punitive damages in the highest amount allowed by law against Defendants Treadway, Wesson, Bowman, Schuetz, Evans, and Shaw;

xii.    An official written apology from all Deputies involved, Bill Blackburn, and Llano County;

xiii.    Declaratory relief that a violation of Fortney's civil rights occurred by all Defendants; and Award and grant such other just relief as the Court deems proper.

Respectfully Submitted,
**KAPLAN LAW FIRM, PLLC**
2901 Bee Cave Rd., Ste. G
Austin, Texas 78746
Telephone: (512) 553-9390
Telecopier: (512) 692-2788
www.kaplanlawatx.com

By: */s/Austin Kaplan*
Tanner Scheef
State Bar No.: 24129188
tscheef@kaplanlawatx.com
Ryan Estes
State Bar No.: 24120586
restes@kaplanlawatx.com
Austin Kaplan
State Bar No.: 24072176
akaplan@kaplanlawatx.com
Andrew Eckhous
State Bar No.: 24129188
Aeckhous@kaplanlawatx.com
Trenton Lacy
State Bar No.: 24106176
tlacy@kaplanlawatx.com

**COUNSEL FOR PLAINTIFF**