IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **SCOTT FORTNEY**<br>    *Plaintiff*,<br><br>v.<br><br>**LLANO COUNTY, TEXAS; BILL BLACKBURN; JAMES TREADWAY; RANDY "TY" SHAW; RUSSELL WESSON; DUSTIN SCHUETZ; BRAD EVANS, and RONALD BOWMAN,**<br>    *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§   CASE NO. 1:25-cv-00868-ADA<br>§<br>§<br>§<br>§<br>§<br>§ |

### INDIVIDUAL DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE ALAN D. ALBRIGHT:

Llano County Sheriff's Office ("LCSO") Deputy James Treadway ("Deputy Treadway"), LCSO Deputy Randy "Ty" Shaw ("Deputy Shaw"), LCSO Sergeant Russell Wesson ("Sergeant Wesson"), LCSO Deputy Dustin Schuetz ("Deputy Schuetz"), LCSO Chief Deputy Brad Evans ("Chief Deputy Evans"), and LCSO Deputy Ronald Bowman ("Deputy Bowman") (collectively, the "Individual Defendants" or "Deputies") file this Rule 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") (Dkt. 12-1) and, in support thereof, would respectfully show the Court as follows:

### I.
### INTRODUCTION

1. On the night of June 18, 2023, Llano County Sheriff's Deputies responded to a "shots-fired" 9-1-1 call. Plaintiff Scott Fortney's ("Fortney") brother—the victim—called 9-1-1 to report that, after a day of heavy drinking on the lake, Fortney had fired a firearm and threatened to

kill his family members. Fortney's brother further reported that Fortney was still armed and had likely taken cover in his white Freightliner truck.

2. When deputies arrived on the scene, they surrounded the truck and used a loudspeaker to identify themselves and command Fortney to exit the vehicle. When Fortney did not respond, Deputy Treadway opened an unlocked door to the truck. Deputy Treadway gave additional verbal warnings, informed Fortney that, if he did not identify himself and show his hands, then Deputy Treadway would deploy his K9 with instructions to bite. Again, Fortney did not respond.

3. Given their suspicion that Fortney was still armed, the Deputies reasonably believed that an exigency existed to justify an entry into and search of the vehicle. Given the fact that the sleeper cab was a narrow space filled with clutter, the arresting Deputies faced potentially lethal risks—Fortney could have easily retrieved the firearm from an infinite number of hiding spots. To minimize risk to officers, Deputy Treadway released his K9 into the sleeper cab. Upon entry, a disoriented and intoxicated Fortney was slow to respond to officer commands. In less than 120 seconds, the Deputies subdued Fortney and effectuated the arrest by placing handcuffs on his wrists. As soon as the handcuffs were secured, Deputy Treadway gave the K9 a release command.

4. As explained in greater detail below, Fortney's claims against the Individual Defendants cannot overcome qualified immunity and should be dismissed accordingly. Fortney has failed to plausibly allege that his constitutional rights were violated. And, even if he could, Fortney cannot show that such rights were clearly established in June 2023. For these reasons, the Individual Defendants respectfully request that the Court grant this Motion and enter judgment in their favor.

## II.
## RULE 12(B)(6) STANDARD

5.      A complaint must be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court's first task on a motion to dismiss is to separate the complaint's legal conclusions—which do not receive a presumption of truth—from its factual allegations. *See id*. at 678–79. Once the legal conclusions are set aside, the remaining factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

6.      If the complaint pleads facts that are "'merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "Where the well-pleaded facts do not permit the court to infer more than a possibility of misconduct, the complaint has alleged – but has not 'show[n]' 'that the pleader is entitled to relief,'" and, therefore, should be dismissed. *Id*. (quoting FED. R. CIV. P. 8(a)(2)). "[A] court is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions." *Hoyt v. Am. Nat'l Ins. Co.*, 2021 U.S. Dist. LEXIS 125069, at *10 (N.D. Tex. July 6, 2021) (citing *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005)); *see also Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir. 1992) ("conclusory allegations and unwarranted deductions of fact are not admitted as true by a motion to dismiss.").

## III.
### QUALIFIED IMMUNITY STANDARD

7. To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that a defendant deprived him of a federal right and that the defendant acted under color of state law. *See Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020). Qualified immunity, however, "adds a wrinkle." *Id.* "The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). After an officer pleads qualified immunity, a plaintiff "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Arnold*, 979 F.3d at 267. "The crucial question is whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983 and would overcome their qualified immunity defense." *Terwilliger v. Reyna*, 4 F.4th 270, 280 (5th Cir. 2021) (cleaned up).

8. There is a two-part test to overcoming qualified immunity. "First, [courts] ask whether the facts, 'taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a federal right.'" *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014)). "[S]econd, [courts] ask whether the right in question was 'clearly established' at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Id.* (internal quotation marks omitted).

9. "[A] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Melton v. Phillips*, 875 F.3d 256, 265 (5th Cir. 2017) (en banc) (internal quotation marks omitted). This is a "demanding standard." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015). As the Fifth Circuit has explained:

> The Supreme Court has repeatedly told courts . . . not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

*Guerra v. Castillo*, 82 F.4th 278, 285 (5th Cir. 2023) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks omitted)). Thus, to defeat qualified immunity, a plaintiff must demonstrate that "it would be clear to a reasonable officer that his conduct was unlawful ***in the situation he confronted***." *Hernandez v. United States*, 785 F.3d 117, 120 (5th Cir. 2015) (en banc) (emphasis added) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

## IV.
### EXHIBITS

10. In the Fifth Circuit, it is well-established that, when evaluating a motion to dismiss, a court may consider "any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)).

11. Here, Fortney's Complaint plainly refers to Deputy Bowman's Incident Report,[1] Deputy Schuetz's body worn camera ("BWC") footage,[2] Deputy Bowman's BWC footage,[3] Sergeant Wesson's BWC footage,[4] and LCSO's "written policy."[5] Therefore, the Court should consider these exhibits when resolving the Motion to Dismiss. *See, e.g., Terrell v. Town of Woodworth,* No. 23-30510, 2024 U.S. App. LEXIS 3803, at *12-13 (5th Cir. 2024) (holding that district court properly considered BWC footage when resolving motion to dismiss because plaintiff

---

[1] *See* Dkt. 12-1, ¶ 66.
[2] *See* Dkt. 12-1, ¶ 40.
[3] *See* Dkt. 12-1, ¶ 41.
[4] *See* Dkt. 12-1, p. 8, n. 2.
[5] *See* Dkt. 12-1, ¶¶ 149-150.

"consistently referenced the video evidence in his complaint, providing still shots from the videos, and the video evidence is clearly central to his claims against Defendants in this suit").

12. Accordingly, in support of this Motion to Dismiss, the Deputies attach the following exhibits:

- **Exhibit A**: Deputy Bowman's Incident Report;
- **Exhibit B**: Deputy Schuetz's BWC footage;
- **Exhibit C**: Sergeant Wesson's BWC footage;
- **Exhibit D**: Deputy Bowman's BWC footage; and
- **Exhibit E**: LCSO's Written Canine Operations Policy.

## V.
## ARGUMENT & AUTHORITIES

A. **Plaintiff's Claims Against the Individual Defendants**

13. Fortney asserts the following claims under 42 U.S.C. § 1983 against the Individual Defendants:

    a. **Excessive force** against Deputy Treadway, Sergeant Wesson, and Deputy Shaw;[6]

    b. **Warrantless search and entry** against Sergeant Wesson, Deputy Bowman, Deputy Shaw, Deputy Schuetz, Chief Deputy Evans, and Deputy Treadway;[7] and

    c. **Failure to intervene** against Sergeant Wesson, Deputy Shaw, Deputy Schuetz, and Deputy Bowman.[8]

14. As explained below, each of these claims is barred by the doctrine of qualified immunity, and dismissal is warranted.

---

[6] *See* Dkt. 12-1, ¶¶ 230-242.
[7] *See* Dkt. 12-1, ¶¶ 252-268.
[8] *See* Dkt. 12-1, ¶¶ 243-251. In Plaintiff's Original Complaint (Dkt. 1), he also alleged failure to intervene against Deputy Bowman but has since dropped that claim.

B.  **Plaintiff's Excessive Force Claims Against the Individual Defendants Are Barred by Qualified Immunity**

15. To state a claim for excessive force, "a plaintiff must establish that he was injured as a result of force that was 'clearly excessive to the need' as well as 'objectively unreasonable' in light of the relevant circumstances." *Tuttle v. Sepolio*, 68 F.4th 969, 974 (5th Cir. 2023) (quoting *Jackson v. Gautreaux*, 3 F.4th 182, 186 (5th Cir. 2021)). "Excessive force claims are thus necessarily fact-intensive and depend on the facts and circumstances of each particular case." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

16. Factors guiding a court's inquiry into the objective reasonableness of the use of force include "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Critically, these considerations must be reviewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

17. Here, the Complaint acknowledges that Deputies responded to a serious crime. It admits that Fortney's brother contacted LCSO because Fortney had discharged a firearm.[9] Indeed, Deputy Bowman's Incident Report (which is expressly referenced in the Complaint) stated:

- "Llano County Deputies were called to the residence of 921 Midland Street in reference to a disturbance involving a firearm." Exhibit A, ¶ 1.

- "While en route, Deputies were advised that the suspect/gunman (Scott Thomas Fortney WM [REDACTED DOB]) had fired the weapon and went and got into his white Freightliner truck . . . and was still armed." Exhibit A, ¶ 2.

---

[9] *See* Dkt. 12-1, ¶¶ 14-19.

- "Sgt. Wesson was speaking with the suspects [*sic*] brother Sean Fortney (victim) and learned that Scott had been drinking heavily and pointed a Sig Sauer .45 caliber handgun at him and told him he was going to kill him." Exhibit A, ¶ 4.

- "Witness Rhionna Fortney . . . saw the incident in the garage shop and said that Scott fired a shot in an unknown direction at the shop and went over by his tractor truck and possibly fired two more shots." Exhibit A, ¶ 4.

18. Thus, before the Deputies arrived on the scene, they understood they were responding to a "disturbance involving a firearm" after which Fortney "got into his white Freightliner truck" and "was still armed." *Id.* at ¶¶ 1-2. And, once they arrived on scene, the victims confirmed that Fortney had (1) pointed a handgun at the brother, (2) made a verbal threat to kill his family member, and (3) discharged his firearm between one and three times. *Id.* at ¶ 4.

19. Therefore, the Deputies' use of force must be considered in light of (1) the fact that they were responding to a shots-fired call, in which Fortney had discharged his firearm and threatened to kill his brother, and (2) the real and present danger that Fortney could still have access to the firearm and, thus, posed a fatal risk of danger to the officers and the victims. *See Bartlett*, 981 F.3d at 332. Although after his arrest, the Deputies learned that Fortney did not have the firearm on his person, that is precisely the type of "20/20 vision of hindsight" that the Supreme Court has instructed lower courts not to consider when evaluating the reasonableness of force. *See Graham*, 490 U.S. at 396.

    i.    **Excessive force claim against Deputy Treadway**

20. The excessive force claim against Deputy Treadway revolves around the dog bites sustained by Fortney. As the FAC acknowledges, Deputy Treadway was the sole K9 handler on the scene.[10] Fortney alleges that, although he "did not offer any resistance or make any threats

---

[10] *See* Dkt. 12-1, ¶ 26.

when the deputies opened the door," he was nonetheless bit by the K9 during the course of his arrest.[11] This allegation, however, *improperly* focuses on Fortney's point of view.

21. The Supreme Court has instructed that the use of force inquiry must be reviewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Here, as the FAC and documents referenced therein acknowledge, a reasonable officer on the scene would have entered the sleeper cab with knowledge that Fortney: (1) had recently made a threat to kill his brother, (2) had pointed his gun at his brother; (3) had discharged his Sig Sauer .45 caliber handgun, (4) was intoxicated, and (5) may still be armed.[12] What's more, the FAC admits that the sleeper cab was narrow, which presented a tactical challenge and potential risk for the officers to enter the space to apprehend a potentially armed suspect.[13] A reasonable officer would recognize that, in such a confined and cluttered space, a suspect could quickly and easily grab a handgun stashed in the sleeper cab, thereby presenting a fatal risk to officers.

22. Additionally, the FAC acknowledges (and the BWC footage confirms) that Deputy Treadway gave Fortney *numerous* opportunities to surrender himself before deploying the K9, making verbal warnings (1) in which he identified himself as a K9 officer with LCSO, and (2) that, unless Fortney showed his hands, he would deploy the K9 with instructions to bite.[14] In the

---

[11] *See* Dkt. 12-1, ¶ 57.
[12] *See* Deputy Bowman's Incident Report, attached hereto as Exhibit A (hereinafter "Exhibit A"), at ¶¶ 2, 4; *see also* Dkt. 12-1, ¶¶ 14-19; Deputy Schuetz' body worn camera footage, attached hereto as Exhibit B (hereinafter "Exhibit B"), at 01:00-01:18 (Fortney's brother reporting to Deputy Schuetz that Fortney "absolutely" has a weapon); *Id.* at 03:57-04:00 (Deputy Schuetz informing other deputies that Fortney is in the Freightliner truck and that "he's got a .45"); Sergeant Wesson's body worn camera footage, attached hereto as Exhibit C (hereinafter "Exhibit C), at 01:35-01:40 (Fortney's brother informing deputies that Fortney is "hammered drunk," "he's got a .45," "he shot it twice and he's got at least 6 or 7 more rounds"); *Id.* at 10:50-11:10 (Fortney's brother informed Sergeant Wesson that Fortney pointed the gun at him and his wife and said "get out of the way or I'm going to kill your fucking husband" and that the gun is a Sig .45).
[13] *See* Dkt. 12-1, ¶¶ 58-59 (alleging that the sleeper cab was "11 feet from the back door to the sleeper area" and that the aisle of the walkway was approximately "26 inches wide").
[14] *See* Dkt. 12-1, ¶¶ 48-49; *see also* Exhibit B, at 40:10-41:12; Exhibit C, at 38:47-39:50; Deputy Bowman's body worn camera footage, attached hereto as Exhibit D (hereinafter "Exhibit D"), at 39:54-40:40.

Fifth Circuit, verbally offering de-escalation in advance of force weighs against a finding that the force was unreasonable. *See, e.g., Fairchild v. Coryell Cnty.,* 40 F.4th 359, 364-65 (5th Cir. 2022) (holding that officers' efforts to "temper or attempt to limit their force by first using verbal commands" weighed against excessive force); *Shumpert v. City of Tupelo,* 905 F.3d 310 (5th Cir. 2018) (the fact that "the officer gave plaintiff a verbal warning to come out or his K-9 would bite him" was one factor (among several) that weighed against excessive force); *Benfer v. City of Baytown,* 2023 U.S. Dist. LEXIS 179262, at *33 (S.D. Tex. Oct. 4, 2023) *aff'd by* 120 F.4th 1272 (5th Cir. 2024) (same).

23.  Finally, the BWC footage referenced in Fortney's FAC also disproves the allegation that "[e]ven after Fortney was in handcuffs and compliant, Treadway had the K9 bite him for 8 more seconds."[15] The BWC footage plainly shows that, as soon as Fortney was in handcuffs, Deputy Treadway gave the K9 a release command, and that the K9 immediately complied.[16]

24.  In summary, the video evidence shows this was a "tense, uncertain, and rapidly evolving" situation in which Fortney posed an "immediate threat to the safety of the officers or others[.]" *Graham*, 490 U.S. at 396. Deputy Treadway made his presence known, informed Fortney that he would release his K9 with instructions to bite, and gave Fortney an opportunity to surrender. Fortney remained silent. Because there was a substantial risk that Fortney was still armed and the tight quarters of the cab which put officers at risk, it was reasonable for Deputy Treadway to deploy his K9 to neutralize Fortney and secure his arrest. *See Kuha v. City of Minnetonka,* 365 F.3d 590, 600 (8th Cir. 2004) ("the mere use of a police dog trained to bite and

---

[15] *See* Dkt. 12-1, ¶ 91.
[16] *See* Exhibit C, at 41:42-41:54 (at 41:45, the first cuff is placed on Fortney's right wrist; at 41:49, the second cuff is placed on Fortney's left wrist; at 41:50, Deputy Treadway gives the release command ("loose"); and at 41:53, the K9 released.).

hold does not rise to the level of constitutional violation"); *Brown v. Police Dep't City of Shreveport*, No. 5:19-CV-00386 SEC P, 2020 U.S. Dist. LEXIS 147126, at *7 (W.D. La. 2020) ("the officers deployed the dog to help apprehend Brown. Once apprehended, the dog did not cause any injury to Brown, nor did the officers command the dog to injure Brown. No excessive force was used here.").

25. The BWC footage shows that, once inside the sleeper cab—which was narrow and cluttered—deputies had a difficult time effecting the arrest and placing handcuffs on Fortney.[17] As soon as the handcuffs were on, Deputy Treadway gave the K9 the release command, and the K9 immediately complied.[18] Given these considerations, viewed from the perspective of a reasonable officer on the scene, Deputy Treadway acted reasonably and did not use unconstitutional force. Therefore, Fortney cannot satisfy the first step of qualified immunity.

26. Under the second step of qualified immunity analysis, the "dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Fifth Circuit has described the second question as "a doozy" for which the plaintiff bears a "heavy" burden to prove that the "constitutional question is beyond debate." *Morrow v. Meachem,* 917 F.3d 870*,* 874 (5th Cir. 2019). Thus, Fortney must identify a controlling precedent that "squarely governs the specific facts at issue." *Id.* at 876–77.[19]

---

[17] *See* Exhibit C, at 40:25-41:54.
[18] *See* Exhibit C, at 41:42-41:54.
[19] The constitutional "right" that must be clearly established is not a general right simply to be free from an unreasonable seizure. *See Manis v. Lawson*, 585 F.3d 839, 846 n.4 (5th Cir. 2009); *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity. . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* Rather, the Supreme Court has explained that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (other citations omitted)).

27. Here, even if the Court finds that Fortney had adequately pled a constitutional violation against Deputy Treadway, he cannot carry his "heavy" burden to prove that the "constitutional question is beyond debate." *Morrow*, 917 F.3d at 874. Failing under the second step of qualified immunity, Fortney's excessive force claim against Treadway must be dismissed.

### ii. Excessive force claims against Sergeant Wesson and Deputy Shaw

28. Although the crux of Fortney's excessive force claim revolves around the decision to release the K9, the FAC also alleges that Sergeant Wesson and Deputy Shaw committed excessive force.[20] Specifically, Fortney alleges that: (1) "Wesson entered the cab and physically seized Fortney's wrists from the front,"[21] and (2) "Shaw entered the cab and put his boot on Fortney's back[.]"[22] Each of these actions were taken **before** Fortney was handcuffed.[23] For the reasons below, these actions—which were taken by Sergeant Wesson and Deputy Shaw to effectuate a valid arrest—do not violate the Constitution. And, moreover, such actions do not violate clearly established law. Fortney's excessive force claims against Sergeant Wesson and Deputy Shaw should be dismissed.

29. As explained above, the severity of the crime was substantial. The Deputies responded to a shots-fired call. The victims both reported that Fortney had discharged his Sig Sauer .45 caliber handgun and threatened to kill his brother.[24] Additionally, based on 9-1-1 dispatch and on-scene interviews with the victims, the Deputies learned that Fortney was still armed—and, therefore, posed an immediate threat to the safety of officers.[25] In the course of effecting the arrest

---

[20] *See* Dkt. 12-1, ¶¶ 234, 236.
[21] *Id.* at ¶¶ 234, 75.
[22] *Id.* at ¶ 236.
[23] *See* Exhibit C, at 40:50-40:55 (Sergeant Wesson grabbing Fortney's wrists); *Id.* at 41:25-41:33 (Deputy Shaw placing his boot against Fortney's back).
[24] *See* Exhibit A, at ¶ 4.
[25] *See* Exhibit A, at ¶¶ 2, 4; *see also* Exhibit B, at 01:00-01:18 (Fortney's brother reporting to Deputy Schuetz that Fortney "absolutely" has a weapon); *Id.* at 03:57-04:00 (Deputy Schuetz informing other deputies that Fortney is in the Freightliner truck and that "he's got a .45"); Exhibit C, at 01:35-01:40 (Fortney's brother informing deputies that

in a dark, narrow and confined sleeper cab—in which Fortney could easily access his firearm or another weapon—Sergeant Wesson seized Fortney's wrists.[26] And, once Fortney was brought to the ground, Deputy Shaw briefly placed his foot on Fortney's back to keep him subdued until the handcuffs were secured.[27]

30.     "The objective reasonableness of [] force . . . depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). Indeed, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

31.     Fortney's own allegations—as well as the BWC footage—do **not** show that Sergeant Wesson and Deputy Shaw struck Fortney, attempted to hurt him, or used more force than necessary to accomplish the arrest. *See Bush,* 513 F.3d at 501-02 (the "right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."); *Trammell v. Fruge*, 868 F.3d 332, 343 n.9 (5th Cir. 2017) (finding that the plaintiff did not "rais[e] sufficient facts to allege an independent excessive force violation" when he accused the defendant of "grab[bing] [the plaintiff's] left arm"). Rather, they applied minimally invasive force for the minimal amount of time required to secure Fortney in handcuffs.

---

Fortney is "hammered drunk," "he's got a .45," "he shot it twice and he's got at least 6 or 7 more rounds"); *Id.* at 10:50-11:10 (Fortney's brother informed Sergeant Wesson that Fortney pointed the gun at him and his wife and said "get out of the way or I'm going to kill your fucking husband" and that the gun is a Sig .45).
[26] Dkt. 12-1, ¶¶ 234, 75, 58-59; Exhibit C, at 40:50-40:55.
[27] Dkt. 12-1, ¶ 263; Exhibit C, at 41:25-41:33.

32. Fortney's excessive force claims against Sergeant Wesson and Deputy Shaw fail for an additional reason. An excessive force plaintiff must establish a constitutionally sufficient injury. *See Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022) (en banc). Specifically, the Fifth Circuit requires a plaintiff to establish an injury that is "more than de minimis[.]" *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). Here, the FAC does not allege that Fortney suffered any injury—let alone a constitutionally sufficient injury—***as a result of the force used by Sergeant Wesson and Deputy Shaw***. On the contrary, the only injury alleged by Fortney is that he suffered dog bites.[28] Because Fortney failed to adequately plead a constitutionally sufficient injury as to the excessive force claims against Sergeant Wesson and Deputy Shaw, these claims should be dismissed. *See Barnes v. City of El Paso*, 677 F. Supp. 3d 594, 605 (W.D. Tex. 2023) ("Since Barnes has not alleged that Meise's holding of her shoulder caused her to suffer any injury, her First Amended Complaint fails to state an excessive force claim against Meise directly").

33. Even if the Court finds that Fortney has adequately pled excessive force claims against Sergeant Wesson and Deputy Shaw, Fortney cannot carry his "heavy" burden to prove that the "constitutional question is beyond debate." *Morrow,* 917 F.3d at 874. Because Fortney cannot identify precedential case law that "squarely governs the specific facts at issue," step two of qualified immunity requires dismissal of the claims against Sergeant Wesson and Deputy Shaw.

C. **Plaintiff's Warrantless Entry/Search Claims Are Barred by Qualified Immunity**

34. Fortney alleges that the Individual Defendants violated his Fourth Amendment rights by entering his Freightliner truck without a warrant.[29] Although "searches and seizures inside a home without a warrant are presumptively unreasonable,"[30] "[i]f an individual poses a

---

[28] *See* Dkt. 12-1, ¶¶ 99-102, 233, 237-238.
[29] *See* Dkt. 12-1, ¶¶ 253-254.
[30] *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).

threat . . . that 'may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment.'" *Clark v. Thompson*, 850 F. App'x 203, 210 (5th Cir. 2021) (per curiam) (quoting *Rice v. ReliaStar Life Ins.*, 770 F.3d 1122, 1131 (5th Cir. 2014)). For example, exigent circumstances may permit officers to make a warrantless entry "where firearms are present." *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995) (quoting *United States v. Mendoza-Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992), *cert. denied*, 510 U.S. 936 (1993)); *see also United States v. Turner*, 125 F.4th 693, 704 (5th Cir. 2025). Ultimately, "[a]n action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

35. "It is well settled that warrantless searches of automobiles are permitted by the Fourth Amendment if the officers have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Degenhardt v. Bintliff*, 117 F.4th 747, 755 (5th Cir. 2024) (quoting *United States v. McSween*, 53 F.3d 684, 686 (5th Cir. 1995)). "Whether an officer has probable cause to search a vehicle depends on the totality of the circumstances viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search." *McSween*, 53 F.3d at 686 (quotation omitted).

36. As explained above, the FAC and the documents referenced in it acknowledge that the Deputies responded to a shots-fired call and were informed by dispatch and the victims that Fortney: (1) had made homicidal threats, (2) had pointed his Sig Sauer .45 caliber handgun at his brother; (3) fired his handgun, and (4) was still armed.[31] Additionally, the FAC admits that prior to entering Fortney's Freightliner truck, the Deputies "used the Public Address ('PA') system to

---

[31] *See* Exhibit A, pp. 2-3; Exhibit B, at 01:00-01:18, 03:57-04:00; Exhibit C, at 01:35-01:40, 10:50-11:10.

command Fortney to exit the vehicle *but received no response*."[32] These allegations demonstrate that the Deputies confronted "an exigency" that made "the needs of law enforcement so compelling that a warrantless entry [was] objectively reasonable under the Fourth Amendment.'" *Clark*, 850 F. App'x at 210 (quoting *Rice*, 770 F.3d at 1131). In other words, the warrantless entry and search were objectively reasonable given the potential threat Fortney posed to his brother, sister-in-law, and the deputies themselves. *See, e.g., Langiano v. City of Fort Worth*, 131 F.4th 285, 293 (5th Cir. 2025); *Tamez v. City of San Marcos*, 118 F.3d 1085, 1095 (5th Cir. 1997) ("the presence of an armed suspect who poses an immediate threat to citizens can justify warrantless searches").[33]

37. In *Tamez*, the Fifth Circuit upheld the warrantless entry and search of a home where officers responded to a "shots fired" call at night; the defendant, a recognized suspect in another crime, had fired a pistol in his back yard; the officers could hear noise in the house; and the officers had not yet located the firearm at issue. *See Tamez v. City of San Marcos, Tex.*, 118 F.3d 1085, 1087-88, 1096 (5th Cir. 1997). Under these circumstances, the Fifth Circuit concluded that a reasonable officer could have believed the safety of the general public and officers was at issue. *Id.* at 1095-96.

38. Similarly, here, the Deputies responded to a shots-fired call, Fortney had fired between one and three shots and made a threat to kill his brother, the victims reported that Fortney

---

[32] *See* Dkt. 12-1, ¶ 31 (emphasis added).

[33] The Fifth Circuit has consistently acknowledged the distinction between when searches of an automobile versus a residence pass constitutional muster. For example, in *United States v. Holmes*, 537 F.2d 227 (5th Cir. 1976), the Fifth Circuit noted that "[t]his Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment" and that "warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not." *Id.* at 236 (citing *Cady v. Dombrowski,* 413 U.S. 433, 439-440 (1973)). Similarly, the Fifth Circuit noted in *United States v. Weinrich*, 586 F.2d 481 (5th Cir. 1978) that "[t]he Supreme Court has several times reaffirmed the validity of warrantless automobile searches on the basis of an automobile's mobility and the special dangers it presents for the destruction of evidence." *Id.* at 492-93 (citing *Cady*, 413 U.S. at 433). And in *United States v. McLaughlin*, 578 F.2d 1180, 1183 (5th Cir. 1978), the Fifth Circuit observed that the Supreme Court has "sanctioned warrantless auto searches in the absence of any exigencies created by the mobility or vulnerability of the searched vehicle," noting that the justification for those searches was "the diminished expectation of privacy which surrounds the automobile." *Id.* at 1183 (citing *Cady*, 413 U.S. at 441-42).

had retreated into his Freightliner truck and was still armed, and Fortney failed to respond to the Deputies' verbal commands that he exit the vehicle.[34] In these circumstances, a reasonable officer could have believed the safety of the victims and officers was at issue, thereby justifying the warrantless entry and search. Because Fortney's FAC and the documents referenced in it show that no unconstitutional entry or search occurred, the Court should dismiss Fortney's Fourth Amendment warrantless search and entry claims.

39.     Even if the Court concludes that Fortney has adequately pled such a claim, dismissal is nonetheless appropriate because Fortney is unable to satisfy the second step of qualified immunity; Fortney cannot identify a controlling a precedent that "squarely governs the specific facts at issue," such that the constitutional question is "beyond debate." *Morrow v. Meachem,* 917 F.3d 870, 874, 876-77 (5th Cir. 2019).

D.     **Plaintiff's Failure-To-Intervene Claims Are Barred by Qualified Immunity**[35]

40.     To establish a failure to intervene claim, a plaintiff must allege that the officer (1) knew that a fellow officer was violating an individual's constitutional rights, (2) had a reasonable opportunity to prevent the harm, and (3) chose not to act. *See Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). One focus of the bystander-liability inquiry is whether the bystander officer has "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). An officer's mere presence at the scene, without more, is insufficient to establish a claim for failure to intervene. *See Vasquez v. Chacon*, No. 3:08-CV-2046-M (BH), 2009 U.S. Dist. LEXIS 129410, at *14 (N.D. Tex. June 26, 2009), *aff'd*, 390

---

[34] *See* Exhibit A, pp. 2-3; Exhibit B, at 01:00-01:18, 03:57-04:00; Exhibit C, at 01:35-01:40, 10:50-11:10, 39:22-39:52.

[35] If the Court concludes that Plaintiff has failed to state a claim for relief on his excessive force claims, then the failure-to-intervene claim must also fail. *See Spencer v. Rau,* 542 F. Supp. 2d 583, 594 (W.D. Tex. 2007) ("the presence of excessive force [is] essential to a failure to intervene § 1983 violation."); *see also Gilbert v. French,* 364 F. App'x 76, 83 (5th Cir. 2010).

F. App'x 305 (5th Cir. 2010) (per curiam). "In evaluating whether an officer took reasonable measures to protect a suspect, courts have considered both the *duration* of the alleged use of excessive force by other officers and the *location of the suspect* relative to the officer against which a claimant seeks bystander liability." *Id.* at *14-15 (emphasis added).

41.     Fortney's FAC glosses over the requirement that the bystander officer have "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Hale*, 45 F.3d at 919. Instead, Fortney simply offers a formulaic recitation of this element of his failure-to-intervene cause of action.[36] It is well-established that "a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Funke v. Deutsche Bank Nat'l Trust Co.,* 2014 U.S. Dist. LEXIS 104438, at *14 (W.D. Tex. July 31, 2014) (holding that a formulaic recitation of a claim's elements has been repeatedly deemed insufficient to survive a FED. R. CIV. P. 12(b)(6) motion).

42.     On the contrary, Fortney's FAC gives rise to the inference that Sergeant Wesson and Deputies Shaw and Schuetz *lacked* the ability to prevent or halt the K9 from biting Fortney. The FAC acknowledges that Deputy Treadway was the K9's sole handler and that no other K9 officers were on the scene.[37] The FAC also alleges that it was Deputy Treadway alone who gave commands to the K9, and that the K9 complied with these commands.[38] Finally, the FAC mentions that Llano County has specific written policies that discuss K9 handler qualifications and trainings.[39]

---

[36] *See* Dkt. 12-1, ¶ 244 (alleging that the Defendants "failed to intervene, despite having a realistic opportunity to do so"); *Id.* at ¶ 246 (alleging that the Defendants "had the opportunity and means to stop the assault"); *Id.* at ¶ 249 (alleging that the Defendants "failed to prevent or halt the K9 attack").
[37] *See* Dkt. 12-1, ¶ 26.
[38] *See* Dkt. 12-1, ¶¶ 50, 52-55, 67, 71.
[39] *See* Dkt. 12-1, ¶¶ 149-150; *see also* LCSO's Canine Operations Policy, attached hereto as Exhibit E (hereinafter "Exhibit E").

43. Taken together, the only plausible inference available from Fortney's FAC is that the non-K9 deputies (Sergeant Wesson, Deputy Shaw and Deputy Schuetz) did **not** have a "reasonable opportunity to intervene" (even if they intended to) because they lacked the training and rapport with the K9 to command it to stop. Indeed, the FAC does not allege *how* these Defendants could have intervened to command the K9 to stop. When a law enforcement officer is unable to intervene, a failure-to-intervene claim against him fails as a matter of law. *Cf, Tuttle v. Sepolio*, 68 F.4th 969, 974 (5th Cir. 2023) (dismissing failure-to-intervene claim when "even viewing the allegations in Plaintiffs' favor . . . they fail to show that the officers had a sufficient opportunity to intervene while the firefight was in progress").

44. Finally, assuming *arguendo* that Fortney has adequately pled a failure-to-intervene claim against Sergeant Wesson, Deputy Shaw, Deputy Schuetz and Deputy Bowman, Fortney cannot satisfy his burden under step two of qualified immunity to show that the constitutional question is "beyond debate." *Morrow v. Meachem,* 917 F.3d 870, 874 (5th Cir. 2019). Absent a controlling precedent that "squarely governs the specific facts at issue," the Court must dismiss the failure-to-intervene claim as pled. *Id.* at 876–77.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Individual Defendants respectfully request that, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court enter an order (i) dismissing Plaintiff's claims against them with prejudice; and (ii) for all such other relief, in law or equity, to which they may show themselves justly entitled.

Respectfully submitted,

**MCGINNIS LOCHRIDGE LLP**
1111 West Sixth Street, Building B, Suite 400
Austin, Texas 78703
512.495.6000 (telephone)
512.495.6093 (telecopier)
mshaunessy@mcginnislaw.com
idavis@mcginnislaw.com

By: /s/ Ian Davis
IAN DAVIS
State Bar No. 24120793
MICHAEL SHAUNESSY
State Bar No. 18134550

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 14th day of October, 2025, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system and that the CM/ECF system will provide service of such filing via Notice of Electronic Filing to the following parties:

Tanner Scheef
Ryan Estes
Austin Kaplan
Andrew Eckhous
Trenton Lacy
KAPLAN LAW FIRM, PLLC
2901 Bee Cave Road, Suite G
Austin, Texas 78746
tscheef@kaplanlawatx.com
restes@kaplanlawatx.com
akaplan@kaplanlawatx.com
aeckhous@kaplanlawatx.com
tlacy@kaplanlawatx.com
*Attorneys for Plaintiff*

/s/ Ian Davis
IAN DAVIS